Mr. Justice DANIEL
 

 delivered the opinion of the court.
 

 The important legal questions arising upon this record, and on which the decision of the cause must depend, appear to be these: —
 

 1st. The nature and extent of the estate embraced within the power reserved to the feme by the marriage settlement; viz., whether that power comprised as well real as personal estate, or was limited to interest, rents, and profits merely, and by name.
 

 2d. The mode of appointment indicated by the marriage contract, and whether this mode has been shown to have been either strictly or substantially and fairly complied with in the requisites of signing, sealing, and attestation. ■
 

 Before proceeding to a particular examination of the questions above stated, it may be proper to premise some observations with respect to the charges in the bill; and first, of undue marital influence, and secondly, of fraud as means employed in accomplishing the wrongs to which the ■ complainant alleges she has been subjected, and against which she has sought relief. With regard to the first of these alleged means, it must be remarked, that no certain or specific mode or act, neither coercion, allurement, nor wilful misrepresentation or falsehood, is charged, by which the free will, the judgment, or the inclination of the complainant has been restrained or misled. Every feme covert is presumed, under a settlement like the one in the present case, to be to some extent a free agent; and she must or ought to be presumed to entertain dispositions of kindness towards her husband. But if, in the indulgence of such dispositions, she should make an unlucky or unprofitable appointment, it would be carrying the principle of protection to ■ail extreme destructive of every conception of free agency, to determine that these untoward results were in themselves proofs of' undue marital influence. The husband does not answer the bill in this case, and there is no direct evidence introduced to sustain this charge as to him; but some of the facts in the testimony go very far to contradict this allegation*, — as', for instance, the conduct of the feme, manifested and repeated
 
 *28
 
 long after the separation from her husband had at any
 
 rate
 
 exempted her from any influence his presence and immediate agency might have been supposed to exert. This same conduct of the feme, 'her positive cooperation in the arrangements for the sale of the property, and her acquiescence in that sale until after the title had been made to the purchaser, furnish such presumption of the absence of fraud in the transactions complained of, which, if it is not absolutely conclusive, certainly calls for contravening evidence of a direct and powerful character, — evidence of force sufficient to overthrow and set aside the complainant’s own acts and declarations. But independently of the facts and circumstances just adverted to, the positive denial of fraud in every answer in the cause, and the absence of any proof to sustain it, should alone be taken as a complete refutation of the charge.
 

 We will how particularly consider the nature and extent of the estate reserved to the complainant by the marriage settlement, and which was embraced within her power to appoint, by a just construction of that instrument. It is alleged in the bill, that this estate was limited to interest, as synonymous with income, rents, and profits,
 
 eo nomine,
 
 and did not extend to the fee of the real estate, nor to the principal of the stock settled to the uses of • the marriage. By every sound rule of construction, an instrument should be interpreted by the context, so as if possible to give a sensible meaning and effect to all its provisions
 
 ;
 
 and so as to avoid rendering portions of it contradictory and inoperative, by giving effect to some clause's to the exclusion of others. Expounded by this rule, let us see what will be the character of the estate here limited to the wife, and what the extent of her power to appoint in relation thereto.
 

 " The deed of settlement begins by reciting, “ that, whereas the said Harriet Y. Nicoll is now possessed of a considerable real and personal estate, which it has been agreed should be settled to her sole and separate use, with power to dispose of the same by appointment or devise.” The deed then sets forth the estate, real and personal, conveyed by it, and enumerates the trusts created thereby, and amongst them the one involved in this controversy^ and differently interpreted by the parties thereto, as follows, viz.: that the trustee “ shall and do permit the said Harriet Y. Nicoll, the intended wife, to have, receive, take, and enjoy all the interest, rents, and profits of the property hereby conveyed, to and for her own use and benefit; or to the use of such person or persons, and in such parts and proportions, as she, the said Harriet Y. Nicoll, shall from time to time during the coverture, by writing, appoint, &c., or to such person or
 
 *29
 
 persons as she by her last will and testament, &c., may devise or will the same to; and in default of such appointment and devise, then the estate and premises aforesaid to go to those who may be entitled thereto by legal distribution.”
 

 Let it be here remarked, that the object of the deed is declared to be the settlement of the whole of the estate, real and personal, upon the married woman, with power to dispose of the whole of it, either by appointment or devise. It will not be denied that this investment of, and authority over, the whole estate, so explicitly declared, might not have been modified or even revoked by subsequent provisions of the same instrument; 'but certainly they should be made to yield only to declarations equally explicit, or to such as are absolutely contradictory to and irreconcilable with them. Can it be correctly affirmed of the subsequent and specific designation of the trusts in this deed, that they are either plainly contradictory, or irreconcilable with the purposes of the settlement previously and so explicitly declared ? May not the term interest, contained in that enumeration, considered in its relative collocation to the terms
 
 rents
 
 and
 
 profits,
 
 be understood as equivalent with the word
 
 estate,
 
 especially when the terms
 
 rents
 
 and
 
 profits
 
 may be correctly taken to cover interest understood as mere revenue, and still more especially when we keep in view the previous purpose set forth in the deed, — that of settling on the feme, and subjecting to her disposition by deed or will, the whole of her estate, real and personal ? Certainly there is nothing in the term
 
 interest
 
 incompatible with' the meaning of the terms
 
 estate
 
 or
 
 property,
 
 for in an ordinary as well as in a technical acceptation, interest may imply both estate and property. But there is another illustration of this matter which would seem to put it beyond farther doubt, that the power of appointment in question cannot by any rational construction be restricted to interest understood as revenue or money, or to rents and profits
 
 eis no-minibus.
 
 Let it be again remarked, that, by the preceding part of the marriage coutract, all the estate, real and personal, was settled to the feme, with power to appoint the whole, without exception, by deed or will. Then, after the words which it is insisted for the complainant restricted her power, we have, at the conclusion of the deed, these words: — “ and in default of such appointment or devise, then the estate and premises aforesaid to go to those who may be entitled thereto by legal distribution.” Now the construction which would restrict her power -to interest, rents, and profits, would seem as if intended to make' the fee or inheritance depéndent upon the contingency of an appointment of these mere chattel interests by the feme; — if
 
 *30
 
 she fail to appoint these, which alone it is insisted she had power to appoint, then, as a condition or consequence, “ the estate and premises aforesaid ” to go to those who may be entitled thereto by distribution. Let it be supposed that, being thus restricted, she does appoint these chattel interests; what then becomes of the inheritance or fee ? The feme cannot, according to the argument, control or appoint it either by deed ■or will; this, it is said, is beyond her power. Does it not in this aspect of the case descend, or become subject to distribution, precisely as it was to do as the condition of non-appointment ? So that, whether she appoints or not, the fee or inheritance goes precisely the same way. This construction renders the provisions of the marriage contract useless and unmeaning. It contemplates on the part of the wife an action wholly nugatory as to the ultimate disposition of the fee, which it places entirely beyohd her control either by deed or by will, and leaves it to pass according to the law of inheritance whether she be active or quiescent. This confusion and obscurity in the construction of the contract is removed by taking the context, — by connecting the first clear and positive declaration of its objects, viz. the settlement on the feme of all her real and personal estate, and' the power in her to appoint the same by deed or will, with the concluding provision of that contract, which declares that, in default of appointment or devise,
 
 “
 
 then all the estate and premises aforesaid,” covering the whole deed; not the interest on money, not the dividends on stocks, nor profits of any kind, but the whole estate conveyed and settled, shall go to those who may be entitled .thereto by legal distribution. This construction gives consistency and meaning to. the entire contract, and satisfies us that the power of appointment reserved to the wife was coextensive' with the whole estate and subjects of the settlement.^
 

 It remains next to be considered whether the mode of appointment prescribed or indicated by the marriage contract, whether the power be construed in an extended or restricted . sense, has been strictly or fairly and substantially complied with. On behalf of the appellant it is insisted, that, in the-deed of the 9th day of October, 1827, from John H. Ladd, the trustee in the marriage settlement, and Harriet
 
 V.
 
 Ladd, to John Hooff,. as trustee for the Farmers’ Bank of Alexandria, regarding that deed as an appointment by Mrs. Ladd, under a competent power, still in its execution there has been such a departure from the mode prescribed for the exercise of the power by Mrs. Ladd, as renders her act wholly inoperative and void. The marriage contract, after securing the prop
 
 *31
 
 erty settled to the use of the wife, proceeds thus: — “or to the use of such person or persons, and in such parts and proportions, as she, the said Harriet Y. Nicoll, shall appoint from time to time, during the coverture, by any writing or writings
 
 under her hand and
 
 seal,
 
 attested by three credible witnesses.”
 
 The deed to Hooff, it will be seen, after reciting that John H. Ladd, the trustee in the marriage contract, in execution of the trusts expressed and declared in the marriage contract, and for a pecuniary consideration, does grant, bargain, and sell to Hooff; and, after farther recital that “ the said Harriet V. Ladd, in execution of the power of appointment to her reserved in the settlement, does hereby direct and appoint the premises herein before described to be held by the said John Hooff and his heirs on the uses and for the purposes and trusts before recited,” concludes in the following language: — “In witness whereof, the said John H. Ladd, Harriet V. Ladd, and John Hooff, have hereunto set their hands and seals the day and year first before written.” Then, after the names and seals of the parties, are written, in the usual place of attestation, these words: — “ Sealed and delivered in presence of George O. Kring, John McCobb, Matthias Snyder, Charles Muncaster, Jonathan Field.”
 

 Upon this state of facts, it has been contended that the execution of the power was defective and null, inasmuch as the power could ba executed only by an instrument under the
 
 hand and seal
 
 of the married woman, and that the attestation of the witnesses shows simply
 
 a sealing and delivery
 
 of the deed of appointment, and shows nothing in relation
 
 to the signing
 
 by the parties. Some objection was made in the argument, founded upon the relative position of the names of the attesting witnesses, as tending, to produce uncertainty as to which of the parties the witnesses meant to testify; but this objection, whether or not under other circumstances it might have been of any importance, was obviated by an exhibition in court of the original deed, which it. was admitted was the document before the court below in the trial of this cause. In considering this objection -to the defective attestation of the instrument of appointment, it is to be observed that the complainant, by her bill, does not impeach the deed on any such ground; on the contrary, she expressly alleges that this deed was
 
 signed
 
 and executed by all the parties thereto, and witnessed by the four persons whose names appear thereon. • Such being the state of facts, it may very properly be questioned whether a party admitting and averring the execution of an instrument, and impeaching only its fairness or its legal operation, exhibiting nothing in the state
 
 *32
 
 of the pleadings requiring his adversary to establish the
 
 execution
 
 of such instrument, can, even in the court of original cognizance, be permitted to deny or question at the trial the existence or execution of the document against his own averment or admission. Such a proceeding would be a surprise in the court below; but it would be still more so if, after the trial, and without even an exception indorsed upon the document, it could be objected to before an appellate tribunal. There is no exception taken to the form or attestation of this deed of appointment found in the record before us. But was there not proof of the full execution of this power, inclusive of signing, according to approved legal intendment? One of the earliest cases, perhaps the earliest, going directly to sustain the exception here urged to the execution of the power, is that of Wright
 
 v.
 
 Wakeford, 17 Vesey, 454. In that case, as in the one before us, the contract creating the power directed the appointment to be made by writing or writings
 
 under hand, and seal;
 
 and in that case as in this, the memorandum of attestation was in the words “ sealed and delivered,” omitting to assert in terms the signature by the maker. Lord Eldon forbore to decide whether this certificate or memorandum embraced the signing as well as the sealing and delivery of the instrument, and sent the case to the Common Pleas, who certified (three of the justices, Heath, Lawrence, and Chambre, •concurring against the opinion of Mansfield, C. J.) that in their opinion the power had not been well pursued.
 

 After Wright
 
 v.
 
 Wakeford, followed the cases of Doe ex dem. Mansfield
 
 v.
 
 Peach, 2 Maule & Selwyn, 576; Wright
 
 v.
 
 Barlow, 3 Maule & Selwyn, 512; Doe ex dem. Hotchkiss
 
 v.
 
 Pearce, 6 Taunton, 402. These cases rest upon Wright
 
 v.
 
 Wakeford, and some, if not all, of them refer to it expressly as their foundation. But, even contemporaneously with tire cases just mentioned, it will be perceived that the courts have in some instances sought to free themselves from these literal trammels of Wright,
 
 v.
 
 Wakeford, as too narrow to comprise the principles of justice and common sense; for as early as 7 Taunton, 355, in the case of Moodie
 
 v.
 
 Reed, which was sent from the Chancery, the will was attested in this general phrase,
 
 “
 
 witness, &c.,” by two witnesses.' In the testimonium clause the testatrix says, “ These bequests are
 
 signed
 
 by me.” Gibbs, C. J., said that this was clearly a good attestation of the signing. Still later, it has been ruled in several cases where the power required a will signed
 
 and published
 
 in presence of three witnesses, that the attestation-was good expressing the will to have been signed and
 
 delivered.
 
 .The
 
 *33
 
 evident disposition of the courts being to adopt the reason and substance of the transaction, they have, as matter of construction, determined that delivery was publication. See 4 Sim. 558; 5 Sim. 118.
 

 But whatever doubt may heretofore have overhung and perplexed this matter, that doubt, so far as the reasonings óf the English bench should shed light upon the judicial mind of our country, ought to be cleared away. This effect, we think, should be produced by the arguments in the House of Lords of the assembled1 judges in the case of Burdett
 
 v.
 
 Spilsbury, reported in 6 Manning & Granger, beginning at p. 386. In this case, presenting, as of course, an exhibition of great ability and learning, the execution and attestation of appointments under powers are the subjects considered. The cases from Wright
 
 v.
 
 Wakeford down, involving any important principle, are reviewed, and these subjects placed upon the basis of common sense. It is true that the facts in the case of Burdett
 
 v.
 
 Spilsbury were not precisely those of Wright
 
 v.
 
 Wakeford, the attestation clause in the latter being special and that in the former case not special; yet in the examination of the latter case, and of those which have followed and been rested upon it, their doctrines are discussed and by a majority of the judges disapproved, several of the judges who conceived themselves constrained to support Wright
 
 v.
 
 Wakeford, upon the maxim
 
 stare decisis,
 
 expressing their regret at the obligation supposed to be binding upon them, and declaring, that, were the case
 
 res integra,
 
 they should certainly reject its doctrines. The extended views of the judges in Burdett
 
 v.
 
 Spilsbury canuot be given consistently with the limits of this opinion, yet some of their illustrations of the principles they maintain may properly be adverted to. And it will be perceived that the substance and meaning of those principles are comprised in the following positions: —
 

 1st. That the terms and modes' prescribed in settlements .for the execution of powers should be followed in reason and substance, so as to insure the purposes and objects contemplated by such settlements, and so as to prevent them from being sacrificed to mere literal severity of construction.
 

 2d. That the memorandum of attestation to a deed or will, whether that memorandum be general or special, is not conclusive as to the ceremony of the execution of the instrument to which such memorandum is annexed, but may be explained by the testimony of the witnesses themselves, or by reference to the testimonium clause of the instrument, as showing the facts and circumstances set forth in that clause, and which the witnesses were called on to attest.
 

 
 *34
 
 Thus in the case of Burdett
 
 v.
 
 Spilsbury, p. 392, Wight-man, Justice, says, — “ The power requires that the instrument shall be signed, sealed, and published by the testatrix in the presence of three witnesses, and that they
 
 shall attest
 
 the instrument. No form of attestation would for the first thirty years have dispensed with the necessity of calling one of the subscribing witnesses, if any were alive, to prove that the formalities required' by the power had been complied with; but after thirty years, the case would rest upon the presumption arising from the production of the instrument itself. In the present case, the instrument shows a general attestation of it by three witnesses, without any statement of the particular facts they attested: but they must be understood to have attested something; and to ascertain what .that is,-there is no principle of law, nor any authority of which I am aware, that prohibits a reference to the instrument itself; and if we look at the instrument for information as to that which it is to be presumed the witness did attest or witness, what do we find ? Upon the face of the instrument which the witnesses attest, the testatrix says, J
 
 do publish and declare this to be my last will and testament. In witness whereof I have set my hand and seal to this my last will and
 
 testament, — and then follows a signature and seal purporting to be those of the testatrix. But supposing such a special form of. attestation as that contended for had been adopted, it would not have varied the character of the evidence derived from the
 
 terms of the instru
 
 ment, and the general attestation of the witnesses. It would but have raised a presumption for the jury that they did wit- ■ ness that which is stated in the attestation, subject to any doubt that might be raised as to whether they really did witness that which is stated in the written attestation or not.”
 

 In the same case, Williams, Justice, says, — “Now the language of the power (as has been already mentioned) is,
 
 by her last will and testament, to ■ be by her signed, sealed, and published in the presence of, and attested by, three or more credible witnesses.
 
 All this is found to have been done, and we are now to see whether, by ordinary and fair construction, neither forcing any interpretation in favor of it, nor wholly excluding any .reasonable inference for the mere purpose of defeating what we know to have been rightly done, the requisites appear to have been complied with. And here it seems very important to attend particularly to the document itself. The will first contains the whole testamentary part; every disposition of the property is first fully made, and the will is therefore as to that, its principal object, complete. The rest regards the manner of
 
 *35
 
 the execution. It is thus: —
 
 I declare this only to be my last will and testament. In witness whereof, I have to this my last ■ will and testament, contained in one sheet, set my hand and seal.
 
 The testatrix signed this part twice, once after the above words,, and again where her seal is affixed, and directly opposite to the latter is the word
 
 witness,
 
 and immediately under it are'the names of the
 
 witnesses;
 
 and the question is whether it is to be understood that they attested, or, in other words, were witnesses to any thing : and if so, how much ? And first it is to be asked, for what purpose was this testimonium clause (as it has been called) introduced, or rather added? Certainly not to explain or to qualify the
 
 will,
 
 or any part of it. To its provisions it has no allusion; but it respects the forms to be observed in the execution of the will, and that only. Why are we to suppose that the testatrix was ignorant of the terms, upon which alone her dispositions could be available? This, the language of the clause shows she did understand. • The clause, therefore; having this object, we come to consider the purpose for which the witnesses are introduced, and I confess I cannot conceive it possible to understand the meaning of their presence, except to
 
 witness something.
 
 If it be said, and with truth, that the witnesses cannot be presumed to be cognizant of the
 
 contents
 
 of the will, because that is contrary to experience, it is surely somewhat contrary to the same ■ experience to suppose, that, when the presence of the witnesses is to be accounted for only by their being brought there to witness something, certain ceremonies were performed, but that they saw nothing of them, and that, too, when the very language of the testimonium (I declare, &c.) imports that the testatrix was making the declaration, not to the winds, but to persons to whom she might address herself, — who were there to see and hear. If, then, the witnesses must be understood to have attested something, I can see no possible reason for stopping short of the conclusion, that they attested every thing which by the clause purports to have been done, that is, signing, sealing, and publication.” Again by the same Justice, p. 433: — “Now, in Wright
 
 v.
 
 Wakeford, the power required the consent of A and B, testified by writing or writings under their hands and seals, attested by two or more credible witnesses. The attestation clause is
 
 sealed
 
 and
 
 delivered
 
 by the within-named A and B, in the presence of C. B. and G. B. Here the. ceremony of signing was omitted in an attestation which professed to give an account of what had been done,
 
 and there tons not, as in the present case, a testimonium
 
 clause.”
 

 In speaking of Wright
 
 v.
 
 Wakeford, Gurney, Baron, remarks,
 
 *36
 
 — “ It is impossible to mention the names of Lord Eldon and the three other judges of the Common Pleas, Heath, Lawrence, and Chambre, otherwise than in terms of great respect. Nevertheless, with all the respect which is due to their authority, I cannot but think it most unfortunate that this decision was ever made. It has led to great injustice. It has disappointed the just expectations of sellers and devisors, and involved the courts in great difficulties.” So, too, Lord Brougham, p. 466: — “ I hardly know a case which has excited, at different times, more remark than Wright
 
 v.
 
 Wakeford. It has been again and again questioned, it has again and again been criticized, by the learned judges. It cannot, therefore, be said to have been at any time a case that commanded any thing like the entire concurrence of Westminster Hall.”
 

 The reasoning of Tindal, C. J.,\in Burdett
 
 v.
 
 Spilsbury, applies with great force and clearness to the question before us.
 
 “
 
 If,” says this judge,
 
 “
 
 the word ‘ witness ’ is taken abstractedly by itself, as constituting the whole of the attestation, I can see no objection to holding that the three persons whose names are subjoined to it must be taken to be witnesses to all that was actually done at the time, which is found by the special verdict to be all that was required to be done. Or, if the word
 
 witness
 
 is to be construed with reference to the statement immediately preceding it at the end of the will, then the word
 
 witness
 
 necessarily implies that the testatrix did in their presence declare the instrument to be her will, andthat she did in their presence put her hand and seal thereto, that is, in the language of the settlement, that she signed, sealed,
 
 and published it
 
 in the presence of these three witnesses. To this construction an objection was taken at your Lordship’s bar, which had also been relied upon by some of the learned judges who delivered their opinions before me; viz. that it proceeds upon the supposition, that the whole instrument may legally be read tosether to explain the meaning of the word witness, and that it supposes the witnesses are conusant of the contents of the instrument, neither of which can be supposed. But l cannot feel the force of this objection. There has been, from the earliest time at which deeds were known, a marked and acknowledged distinction between the operative part of the deed itself, and the
 
 testimonium clause
 
 (as it is called) at the end of the deed. The essential part of the deed is that part, and that only, which contains the grant. The clause at the end is introduced, not as constituting any part of the deed, but merely
 
 tv preserve, the evidence of the due execution o f it.
 
 Admitting, therefore, the deed itself is matter which maybe held to be
 
 *37
 
 confined to the knowledge of the parties, namely, the grantor and grantee, the testimonium clause is expressly introduced into it for the use of the public and the witness to the deed. • It is well known that a similar clause was constantly inserted in old deeds and charters, at the close thereof, beginning with the words
 
 Mis
 
 testibus, and thence generally called the
 
 Mis testibus
 
 clause, in which the names of the persons present, who heard the deed read by the clerk, were written, not by themselves, but by the clerk who prepared the deed. Spelman' in his Glossary, p. 228, traces out the variations in the'form of the clause, at different periods of our history ; and Madox, in the Deputation prefixed to his
 
 Formulare Anglicanum,
 
 goes more fully into the matter, and in the work itself gives numerous instances which it is impossible to read without being satisfied that the sense requires that the witnesses, whose names are inserted in the
 
 Mis testibus
 
 clause, must of necessity have known the words- preceding it, or in fact they would have witnessed nothing at all. Take, for example among many, that numbered 312, —
 
 And that this my gift, grant, and confirmation may remain firm for ever, I have confirmed this present charter with the impression of my seal, Mis testibus,
 
 $*c. Who can doubt for a moment that these witnesses either actually read, or heard read over to them, the words of the deed immediately preceding their names, and that the introduction of the preceding clause had no other object or purpose ? And this practice continued down to the reign of Henry YIIL, as appears by the authority of Lord Cocke, who states the practice then began of separating the attestation from the deed itself, and for the witnesses to subscribe their own names to it, either at the bottom of, or indorsed upon, it. But that the clause
 
 in cujus rei testimonium,
 
 so long as it was found at the close of the deed itself, never formed part of the deed itself, is evident from Shepard’s Touchstone, where he says, — ‘ A deed is good, albeit these words in the close thereof,
 
 in cujus rei testimonium sigillum meum apposui,
 
 be omitted,’ — citing authorities which show that it is no more in fact than what it imports to be, the very attestation of the deed which has preceded it. There is therefore no reason why the word
 
 witness,
 
 written immediately after this testimonium clause, should not be considered as incorporated with it, and as calling the attention of the witnesses to all that had preceded in the testimonium clause.” Again it is said by the same judge, p. 459, —
 
 “ So
 
 far from its being a rule of law that you may not, in the attestation of a deed, look back to that which is found at the close of the deed itself,- that, on the contrary, in most of the cases which have been relied on by
 
 *38
 
 the defendant in error, express reference has been made to the close of the deed itself.”
 

 A quotation from the opinion of Lord Campbell will close these extracts from the opinions in Burdett
 
 v.
 
 Spilsbury, protracted, perhaps, beyond what even this interesting case will warrant. His Lordship says, p. 467, — “ My Lords,- in this case the only question is, whether the will was attested by three credible witnesses.” He proceeds, p. 468, — “ My Lords, independéntly of authority, I cannot doubt that for a moment. The only objection that can be made is this, that the will upon the face of it does not contain any process verbal or history of the transaction. But the power imposes no such condition, — it does not say a will, signed, sealed, and published in the presence of three witnesses and attested by them,
 
 and a will containing a history of the
 
 solemnity, — there are no such words in the power.” Again, p. 469, — “ If it weremecessary, my Lords, I think the testimonium clause here might be resorted to, both upon principle and authority.” These reasonings of the English judges, going to show that, upon principle, and independently of recent statutory provisions, the memorandum of attestation, so far from being conclusive upon the facts of
 
 signing, sealing,
 
 and publishing or delivering an instrument, may itself be controlled, either by the examination of the witnesses themselves, or by reference to the testimonium clause of such instruments, are fully sustained, and even more than sustained, by the authority of the supreme' court of that State from whose jurisprudence” and policy this controversy might be supposed in some degree to take its complexion. If, therefore, the most express’adjudication of the Court of Appeals of Virginia can govern this case, it seems at once disembarrassed of the objections alleged to the execution of the power created by the marriage contract.
 

 The recent decision in the case of Pollock and Wife
 
 v.
 
 Glassel, reported in 2 Grattan, 439, would seem to be decisive of the questions now before us, that case having clearly ruled as the law of Virginia with regard to a deed, that, although the distinctive character of the instrument is to be determined by its intrinsic evidence, the question is still open whether it be the deed of the
 
 party,
 
 and that must be decided by evidence
 
 aliunde.
 
 If by plea of
 
 non est factum,
 
 or other proper denial, the fact that the paper was sealed by the party be put in issue, then1 it must be proved by competent and satisfactory testimony. In Virginia, by long usage, which has received the sanction of a statute, a scroll is used by way of a seal. The decisions have required that the substitution of the scroll for a
 
 *39
 
 seal shall be recognized on the face of the deed, but in no case has it been held that, in the absence of such recognition, evidence is inadmissible to prove that in fact the scroll was affixed to the instrument with intent that it should stand in place of a seal. In the case above referred to, it is said by the court, — “Here the question occurs in a court of probate, whose province it is to examine the subscribing witnesses, and, if their testimony is satisfactory, to establish and perpetuate .the due execution of the instrument. Upon what principle or authority are the subscribing witnesses to be estopped, because of some informality in the paper, from proving the fact, that it was sealed by the testatrix, or, what is the same thing, that she adopted the scroll affixed to it by way of seal ? — In the much stronger case of a deed, there could be no such estoppel in a court of probate.” In the same case the court say, through Baldwin, Justice, — “ It will be seen that the statute requires the will to be
 
 attested
 
 by the witnesses, but does not prescribe what, nor that any, facts shall be stated in their attestation. I think it plain, that the legislature meant nothing more, than that the.instrument itself should be attested, in order to identify the witnesses and designate who are to prove its execution. The object was not to obtain from the witnesses a certificate of the-, essential facts of the transaction, but to provide the means* of proving them by persons entitled to confidence, and selected for the purpose. The subscription of their names denotes that they were present at and prepared to prove the due execution of the instrument so attested, and nothing more. The attestation is the act of the witnesses, and it was not intended to confide to them the duty of stamping their testimony upon the paper; which would avail nothing as evidence, however perfect, and which ought to create no estoppel, however imperfect. This view of the statutory provision is in effect sustained by the English decisions.” Again, p. 465, it is said by the same judge, — “I think it clear that the subscription of the witnesses is substantially the attestation contemplated by the statute; and it is sufficient if the purpose be indicated by the briefest memorandum, or merely by a fair presumption arising from the local position of their signatures upon the paper ; and whether a memorandum of attestation be general or special, it may be denied or contradicted by the subscribing witnesses, in the whole or in part, and of course is open to explanation if in any way ambiguous.” The court then proceed to review the case of Wright
 
 v.
 
 Wakeford, and the cases of Doe
 
 v.
 
 Peach, Wright
 
 v.
 
 Barlow, and Moodie
 
 v.
 
 Reid, rejecting them as authority in the State of Virginia as to the form and influ
 
 *40
 
 ence of the memorandum of attestation, and concurring with the doctrines declared by the majority of the judges in Burdett
 
 v.
 
 Spilsbury.
 

 An objection has been made to the sale under the deed of trust, based upon the fact, that the portion of the property actually sold did not equal in value the whole amount of the debt due to the bank, which it is insisted should have been the case, according to the proviso in that deed. We do not see the force of this objection, inasmuch as, by the express terms of the deed, .authority was given the trustee or the bank to sell the property in separate parcels, as either might deem it necessary or advisable; and it would have been impracticable before an experiment to ascertain
 
 a priori
 
 how much
 
 of the property
 
 would be requisite for the satisfaction of the debt, and thus a literal adherence to the proviso would lead either to the preventing a sale altogether, or to the sacrifice of the whole estate, whether there should have been a necessity for it or not. Moreover, the sale by parcel in this case, was selected upon a calculation of advantage to the feme, and with her express approbation, with the view of saving to her, if practicable, a portion of the property.
 

 Upon full consideration of the facts and the law of this case, the court are of the opinion, that the marriage contract gave power to the feme covert to appoint the entire estate and property embraced within it; that the. provisions and conditions of that contract have been complied with in the execution of the power thereby created and reserved; that therefore the decree of the Circuit Court, dismissing the bill of the appellant, the complainant below, ought to be affirmed, and it is hereby accordingly affirmed.
 

 Order.
 

 This cause came on to be heard on the transcript of the record from the Circuit Court of the United States' for the District of Columbia, holden in and for the County of Alexandria, and was argued by counsel. On consideration' whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said Circuit Court in this cause be, and the same is hereby, affirmed, with costs.